TAGGED OPINION
DO NOT PUBLISH



**ORDERED in the Southern District of Florida on October 08, 2010.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| In re: | Case No. 07-21016-BKC-LMI |
| SUNDALE, LTD., | Chapter 11 |
|         Debtor. | |
| _____/ | |
| FLORIDA ASSOCIATES CAPITAL ENTERPRISES, LLC, | Adv. Case No. 08-1312-BKC-LMI |
|         Plaintiff, | |
| v. | |
| SUNDALE, LTD. and KENDALL HOTEL AND SUITES, LLC, | |
|         Defendant. | |
| _____/ | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**WITH RESPECT TO FINAL JUDGMENT**
**IN FAVOR OF PLAINTIFF/COUNTERDEFENDANT**
**FLORIDA ASSOCIATES CAPITAL ENTERPRISES, LLC.**

This matter arose from a dispute between the now reorganized debtor, Sundale, Ltd.

("Sundale"), and Florida Associates Capital Enterprises, LLC ("FACE").  FACE filed an

adversary complaint to determine the extent, validity, and priority of its claims against Sundale

and Kendall Hotel and Suites ("KHS") (collectively, Sundale and KHS shall be referred to as the "Reorganized Debtors" or the "Defendants").[1]  FACE asserts that it has a claim in the principal amount of $3,250,000, plus default interest accruing at 18% from May 2005 to the effective date of the Debtors' Chapter 11 plan confirmed in the main bankruptcy case, as well as a claim for attorneys' fees, based on loans FACE extended to Sundale, which loans are secured by real estate owned by Sundale, and through a trust by Sundale's principal, Phillip J. Scutieri, Jr ("Mr. Scutieri").

The Defendants assert that the FACE loans were not intended to be enforceable but were, as discussed in greater detail below, a payoff relating to a family dispute between the Scutieri family and a man named Raymond G. Chambers and that the funds paid were merely disguised as a loan. The Defendants assert numerous affirmative defenses, and in counterclaims, seek to declare FACE's loan documents unenforceable and to recoup all monies paid by Sundale to FACE.  FACE asserts various affirmative defenses to the recoupment claim.

Once having waded through all the facts, disputed and undisputed, relevant and irrelevant, there are two issues that I must resolve.  The first issue is the enforceability of release and reaffirmation provisions in mortgage modification agreements executed by Sundale in 2001. Because I find that the release and reaffirmation provisions are enforceable, judgment on Count I of the Plaintiff's Complaint shall be entered in favor of Plaintiff/Counter-Defendant FACE and against the Defendants/Counter-Plaintiffs on Count I of the Counterclaim.  The second issue is whether the Defendants/Counter-Plaintiffs have a valid cause of action for recoupment.  Because I find that the Defendants/Counter-Plaintiffs have failed to demonstrate by a preponderance of the evidence entitlement to recoupment, judgment is entered against Defendants/Counter-

---

[1]  The two debtors were substantially consolidated pursuant to the Order Confirming Debtors' Second Amended Chapter 11 Plan of Reorganization entered in the main bankruptcy case, 07-21016 (DE #1508 dated May 26, 2009).

Plaintiffs with respect to Count II of the Counterclaim. The following constitute my findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding by virtue of Federal Rule of Bankruptcy Procedure 7052.

## JURISDICTION

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §1334(b) and 28 U.S.C. §157. The jurisdiction of the bankruptcy courts is set forth in 28 U.S.C. §1334, which provides, in pertinent part, that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §1334(b). 28 U.S.C. §157(b) provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. §157(b). This matter is a core proceeding under 28 U.S.C. §157(b)(2)(K). With respect to the Counterclaims asserted by the Defendants/Counter-Plaintiffs, this Court has jurisdiction over the lien claim in Count I under 28 U.S.C. §157(b)(2) as a core proceeding and has jurisdiction over the Recoupment claim in Count II under its "related-to" jurisdiction pursuant to 28 U.S.C. §1334(b). Venue is proper in this district pursuant to 28 U.S.C. §1409.

# BACKGROUND HISTORY[2]

While the parties to this dispute are FACE, Sundale and KHS, the facts underlying this dispute start with relationships between the family of Mr. Scutieri, the principal of Sundale and KHS, and Raymond G. Chambers ("Mr. Chambers").  Thus, in order to understand the allegations of the complaint and counterclaim, it is necessary to understand the genesis of the relationship.  We start with the cast of characters.

Mr. Chambers is a successful businessman who made his fortune in the leveraged buy-out business in the 1980s.  For the last two decades, Mr. Chambers has been focused mainly on philanthropic endeavors.  (Raymond Chambers' Trial Testimony at pg. 49:3-23, hereinafter "RC Trial Testimony at pg. ____)."

Delphine Scutieri ("Mrs. Scutieri") was married to Philip Scutieri, Sr. ("Mr. Scutieri, Sr.").  Mrs. Scutieri and Mr. Scutieri, Sr. were the parents of Mr. Scutieri, and Joan Adubato ("Mrs. Adubato").

Frank Adubato ("Buzz" or "Mr. Adubato") was, and still is, married to Mrs. Adubato, the daughter of Mr. Scutieri, Sr. and Mrs. Scutieri.  Mr. Adubato has been one of Mr. Chambers' closest friends.  (RC Trial Testimony at pg. 61:3-14).

Mr. Chambers had a very close personal relationship with the Scutieri family that dates back over forty (40) years.  (RC Trial Testimony at pgs. 53:22-25 and 90:9-10; and Exhibit 404, Raymond Chambers Deposition Transcript dated August 26, 2008, at pgs. 38:9 – 41:12).  Mr.

---

[2]With the exception of two witnesses, Glenn Stankee and Earl Wald, I have little confidence in the truth and veracity of any of the testimony.  I believe a great deal of testimony was the product of manufactured memory, and that time and motivation have colored most of the balance of any otherwise legitimate recollections.  Therefore, in rendering my decision, I must rely on the objective and undisputed facts, and only that testimony that I find most reasonable in light of those objective and undisputed facts.  However, for purpose of background and understanding, even disputed facts are relevant.  Where there is a dispute as to the facts, I will note the dispute.  I heard testimony over eight days.  If I were to include in this opinion all the facts admitted into evidence, this opinion would take up hundreds of pages.  Instead, I have attempted to include those facts that give flavor and context to the ultimate issue but the parties can be well assured that all the testimony and exhibits were reviewed and considered by me in rendering this decision.

Chambers and the Scutieri family lived in New Jersey.  (Exhibit 404 at pgs. 38:9 – 41:12).  Mr. Chambers also had business relationships with Mr. Scutieri, Sr. and Mr. Scutieri at different times.  (*See* Exhibit 2).  Mrs. Adubato introduced Mr. Chambers to his wife, (RC Trial Testimony at pgs. 53:17-19), and at some brief point in time, Mr. and Mrs. Chambers lived with Mrs. Scutieri and Mr. Scutieri, Sr.  Mrs. Adubato was, and may still be, Mrs. Chambers' closest personal friend.  (*Id.* at 53:22-25).

Since the 1980s, Mr. Chambers' wealth and personal financial affairs have been managed by a company called Van Beuren Management ("VBM"), whose only clients are Mr. Chambers and his family and the various entities in which the Chambers family has interests, including various trusts.  (*See* David Roy Trial Testimony at pg. 7:18–8:4, hereinafter "DR Trial Testimony at pg. ___)."  VBM not only administers Mr. Chambers' numerous trusts, but manages all of Mr. Chambers' financial affairs.  VBM is owned by David Roy ("Mr. Roy") and Kurt Borowsky ("Mr. Borowsky"), both of whom are trustees of Mr. Chambers' trusts at VBM.  (DR Trial Testimony at pg. 9:16-25).  There is no dispute that since the formation of VBM, Mr. Roy and Mr. Borowsky have been, and continue to be, responsible for most, if not all, of Mr. Chambers' money, investments, and even personal expenses.  (*Id.* at pgs.  9:10-12:1).

Since the early 1970s, Mr. Scutieri has been the owner, through Sundale or its predecessors, of an approximate nine (9) acre tract of land located at 9100 North Kendall Drive, Miami, Florida (the "Sundale Property").  For a time in the mid-1970s, when there was an assisted living facility for retired senior citizens ("ACLF") located at the Sundale Property, Mr. Chambers and Mr. Adubato had some kind of limited partnership interest in the project with Sundale.  (RC Trial Testimony at pgs. 92:14-93:3).

On or around November 20, 1997, Mrs. Scutieri advised her son, Mr. Scutieri, that she believed that Mr. Chambers, with the help of Mr. Adubato, (who, in November of 1997, became separated from Mrs. Adubato), had taken certain assets of the estate of Mr. Scutieri, Sr. (the "Estate")  (*See* Exhibits  2  and 3).  Mrs. Scutieri further believed that Mr. Chambers used some of these assets to obtain the capital and assets to begin his leveraged buy-out business.  *Id.*

At Mr. Scutieri's request, Mr. Scutieri met with Mr. Chambers in New Jersey several days later.  (Philip Scutieri, Jr., Trial Testimony at pgs. 328:13-329:2, hereinafter "PS Trial Testimony at pg. ____").  At the meeting, Mr. Scutieri asserted Mrs. Scutieri's belief that Mr. Chambers, along with Mr. Adubato, had improperly taken certain assets of Mr. Scutieri, Sr. after his death.  Mr. Scutieri accused Mr. Chambers of betraying his parents.  Both Mr. Scutieri and Mr. Chambers agree the meeting was very emotional, although they dispute virtually everything about what Mr. Chambers and Mr. Scutieri said during the course of the meeting. (*Compare* RC Trial Testimony at pgs. 99:15-102:22 *with* PS Trial Testimony at pgs. 329:9-330:25).

After leaving the meeting at the restaurant, Mr. Chambers spent that night drafting a letter to Mrs. Scutieri until the early morning hours, and sent the letter to Mrs. Scutieri the next day, (RC Trial Testimony at pg. 59:1-16).  This letter contains a detailed explanation by Mr. Chambers concerning his involvement in the disputed assets and that he would "share everything" he had with Mrs. Scutieri and that it gave him "no pleasure whatsoever to have anything" if Mrs. Scutieri was not happy.  (*See* Exhibit 2).

On December 15, 1997, Mrs. Scutieri wrote a letter to Mr. Chambers advising Mr. Chambers that while she was thankful for his recent letter referring to several past transactions between himself and her late husband, Mr. Scutieri, Sr., she was disturbed with information that had recently been brought to her attention.  (*See* Exhibit 3).  Mrs. Scutieri attached a draft

complaint in which she named Mr. Chambers as a defendant, as well as Mr. Adubato, and asked that Mr. Chambers contact Mr. Scutieri to meet and discuss "an amicable solution to my claims." *Id.*

After Mrs. Scutieri sent her letter of December 15, 1997, Mr. Chambers and his agents attempted to resolve the dispute. (DR Trial Testimony at pg. 29:8-14). Meetings were held in Miami between the Scutieris and their lawyer and Mr. Chambers' representatives, Mr. Roy and Mr. Nolan, in order to reach an amicable resolution to Mrs. Scutieri's claims against Mr. Chambers. (RC Trial Testimony at pg. 65:9-24). The last of these meetings occurred in May of 1998.

At the end of June 1998, Gary Moore ("Mr. Moore"), apparently at the request of Mr. Roy, traveled to Miami to find out how Mr. Scutieri wanted to resolve the Scutieri family dispute with Mr. Chambers. (*See* Gary Moore Trial Testimony at pgs. 17:15 – 18:9, hereinafter "GM Trial Testimony at pg.____)." Mr. Moore was a former relative of Mr. Chambers, by marriage, as well as a friend and business associate of Mr. Chambers. (RC Trial Testimony at pgs. 50:10-53:4). Mr. Moore was also working for Mr. Scutieri in connection with Mr. Scutieri's efforts to convert his ACLF to a hotel (the "Hotel Project").

During his visit to Miami, Mr. Moore had dinner with Mr. Scutieri and Mr. Wells, Mr. Scutieri's friend and partner in the Hotel Project. (GM Trial Testimony at pgs. 18:22-19:7). During this dinner, Mr. Scutieri claims that Mr. Moore asked him what it would take to resolve the dispute between the Scutieri family and Mr. Chambers. (PS Trial Testimony at pg. 445:13). There was a second meeting the following day. At some point during one of these two meetings Mr. Scutieri told Mr. Moore the number (presumably to resolve the dispute) was $420,000,000 (the "Number"). Mr. Moore communicated the Number to Mr. Roy. (*Id.* at pg. 21:17-24).

Mr. Scutieri testified that Mr. Roy called him after Mr. Scutieri's meeting with Mr. Moore.  During this call, Mr. Scutieri testified that Mr. Roy told him that we can be "very creative" and "it was going to take some time to get it worked out."  (PS Trial Testimony at pg. 468:3-5).  Mr. Scutieri testified that he believed after this discussion that the matter with Mr. Chambers had been resolved.  (*Id.* at pg. 468:15-17).  However, nothing else happened after June of 1998 until June of 1999.  Mr. Scutieri claims he assumed the delay was because Mr. Roy had told him it would take time to work out logistical issues associated with the settlement.  (*Id.* at pgs. 467:20-468:5).

In June of 1999, Jacqueline Simmons ("Ms. Simmons"), a close friend of the Scutieri family and an acquaintance of Mr. Chambers, called Mr. Chambers and asked if he would meet with her.  (Jacqueline Simmons Trial Testimony at pgs. 21:24-22:7, hereinafter "JS Trial Testimony at pg. ____.").  Ms. Simmons claims she did so at the request of Mr. Scutieri.  (*Id.* at pg. 20:17-21).  Ms. Simmons and Mr. Chambers both agree the crux of the phone call was a discussion about an estrangement between Mrs. Scutieri and her daughter Joan, caused by the dispute with Mr. Chambers. (RC Trial Testimony at pgs. 69:24-70:15; JS Trial Testimony at pg. 22:1-7).  Whatever was actually said on the phone, there is no dispute that within two weeks after the call Mr. Chambers flew out to Palm Springs to have dinner with Ms. Simmons, which dinner lasted quite a long time, and at which dinner the estrangement between Mrs. Adubato and her mother was discussed.  There is also no dispute that at the conclusion of the dinner Mr. Chambers committed to see Mrs. Scutieri in Miami, whether this was his idea or at the request of Ms. Simmons.

Mr. Chambers arranged to meet Mrs. Scutieri and Ms. Simmons, approximately two to three weeks after the dinner meeting, in an American Airlines conference room in the Miami

International Airport (the "Airport Meeting"). (*See* Exhibit 405, Raymond Chambers Deposition Testimony dated August 27, 2008, at pg. 111:6-15.) In attendance at the Airport Meeting, which took place in June 1999, were Mr. Chambers, Mrs. Scutieri, and Ms. Simmons.

What was said at the Airport Meeting is critical to the litigation and is the real start of the story. Mr. Chambers testified that he had told Mrs. Simmons at the dinner meeting in California that he would meet with Mrs. Scutieri only to discuss the rift between her and Mrs. Adubato in hopes of effecting a reconciliation between the two, and would not discuss the accusations Mr. Scutieri and Mrs. Scutieri had made about him. (RC Trial Testimony at pg. 71:3-17 and pgs. 122:20-123:6). Mr. Chambers recalled that the conversation at the Airport Meeting began with a discussion about family, but then Ms. Simmons raised the issue of the dispute between the Scutieris and Mr. Chambers. (*Id*. at pg. 75:1-9). Ms. Simmons told him she had a "creative idea that I think could help resolve the estrangement between Mrs. Scutieri and [Mrs. Adubato]." *Id*. Mr. Chambers testified that the "creative idea" that Ms. Simmons proposed to Mr. Chambers was him lending Mr. Scutieri $10,000,000 for the Hotel Project. (*Id*. at pgs. 75:12-76:13). Mr. Chambers testified that Ms. Simmons told him Mr. Scutieri had upwards of $30,000,000 in equity in the Hotel Project, but that he had not been able to obtain conventional financing because of his reputation and track record. *Id*. Mr. Chambers testified that he asked Ms. Simmons how this could bring about a reconciliation between Mrs. Scutieri and Mrs. Adubato, and that Ms. Simmons' response was that Mrs. Scutieri was very concerned about Mr. Scutieri, and that helping Mr. Scutieri with the Hotel Project would bring about the reconciliation between Mrs. Scutieri and Mrs. Adubato. *Id*. Mr. Chambers testified that he told Ms. Simmons and Mrs. Scutieri that he would not loan $10,000,000, but that if Mrs. Simmons really thought this would bring about a reconciliation between Mrs. Scutieri and Mrs. Adubato, he would recommend to

his "financial advisors that they, (A), help Phil Junior get a conventional first mortgage loan on the Property and, (B), if that loan fell short of the $10,000,000, that I would recommend to them that our entities provide up to $2 million in a subordinated second mortgage loan." (*Id.* at pg. 76:3-13).

Not surprisingly, Ms. Simmons told a different account of what happened at the Airport Meeting. Ms. Simmons testified that once Mr. Chambers arrived, he initiated the conversation and told Mrs. Scutieri that he had met with Ms. Simmons in California and was very disturbed about what was happening within the Scutieri family and that it was due to him, and he "wanted to do whatever [Mrs. Scutieri] wished to correct the problem and make it right, but it was important that the family got back together again." (JS Trial Testimony at pg. 35:12-20). Ms. Simmons testified that Mr. Chambers wanted to know from Mrs. Scutieri what she wanted. (*Id.* at pg. 36:14-37:1). According to Ms. Simmons, Mrs. Scutieri said she wanted a $10,000,000 first payment on the money Mr. Chambers owed her and she wanted the money to go to Mr. Scutieri for his Hotel Project. (*Id.* at pgs. 37:10 – 39:6). Ms. Simmons also testified that Mrs. Scutieri wanted the remaining amount of the $420,000,000, to be "worked out." (*Id.* at pg. 37:10-15).

According to Ms. Simmons, Mr. Chambers told Mrs. Scutieri that he would give $10,000,000 for Mr. Scutieri's Hotel Project, but stated that "it was very complicated and that the monies would have to be disguised as a loan, but he would have his people work it out." (*Id.* at pgs. 38:22-39:12; *see also* Exhibit 30.) Ms. Simmons further testified that Mr. Chambers said the $10,000,000 would be an "initial payment of getting the monies back to Delphine-to the estate of Phil, Sr." (JS Trial Testimony at pg. 39:19-24).

Mr. Chambers denies having agreed to anything other than trying to help Mr. Scutieri get a $10,000,000 loan but acknowledges that, following the Airport Meeting:

> I called Dave Roy and said in order to bring about a reconciliation between Mrs. Scutieri and Joan Adubato, I agreed that one of our entities and our professionals would help Phil Junior find conventional financing for his hotel construction project, and in the event and only in the event that the conventional financing wasn't sufficient to cover the construction cost of this project that I had said to Mrs. Scutieri that one of our entities would lend $2,000,000 in a subordinated note but we hope that conventional financing in the amount of ten million dollars, which is what Jackie Simmons described, could be achieved . . .

*(See* Exhibit 413, Raymond Chambers Deposition taken October 2, 2009, at pgs. 108:12-109:3).

Ms. Simmons testified that immediately after the Airport Meeting,  she advised Mr. Scutieri of Mr. Chambers' promise that he would provide $10,000,000 to complete the Hotel Project and that it would have to be "disguised as a loan."  (JS Trial Testimony at pg. 39:9-12; PS Trial Testimony 480:15-481:14).

Mr. Roy made an arrangement with an attorney named Michael Inglis ("Mr. Inglis"), a personal friend, to create an entity that would provide a mechanism for providing funding to Sundale for the Hotel Project.  The entity they created was FACE.  FACE was formed around August 3, 1999 as a limited liability company.  (Michael Inglis Trial Testimony at pg. 1171:15-18, hereinafter "MI Trial Testimony at pg.____.").  Its two members are VBM and Mr. Inglis. (*Id.* at pg. 1172:17-20).  Mr. Inglis is the managing member.  (*Id.* at 1172:10-11).  Pursuant to the governing documents, VBM provided most of the capital; Mr. Inglis' contribution, other than his labor, was $1,000.  (*Id.* at pg. 1173:3-20).

Funding started almost immediately.  Because FACE had not yet been formed, the initial loans were made in Mr. Inglis' name as lender.   The funds were channeled from one of Mr. Chambers' trusts through VBM to FACE.  Mr. Inglis testified that he knew that VBM would be funding the loan, but Mr. Inglis testified that, until the litigation between FACE and Sundale

started, Mr. Inglis did not know that VBM's only clients were Mr. Chambers and his family interests, or that the loans provided by VBM were funded solely from Mr. Chambers' trusts.  (*Id.* at pgs. 1154:1-55:4).

Initially, the loans were all unsecured, and guaranteed by Mr. Scutieri (the "Personal Guarantees"), apparently because at the time that FACE began to advance funds to Sundale, the north portion of the Sundale Property, on which the Hotel Project was located, was encumbered by a first mortgage lien in favor of an off-shore Cayman Island company called Matsuda Capital (the "Matsuda Lien"), a company owned and controlled by Mr. Scutieri.  (*Id.* at pg. 1199:12-24; *see also* PS Trial Testimony at pg. 784:10-17).  The property was also subject to a lien held by Ms. Simmons (the "Simmons Lien").  (PS Trial Testimony at pg. 798:20-24).

The original monies loaned by FACE or Inglis were evidenced by a series of eight promissory notes (the "Original Notes") totaling $1,700,000.[3]  (PS Trial Testimony at pg. 520:8-17; *see also* Exhibits A1 through A14, 81 and 82), all of which were guaranteed by Mr. Scutieri personally (the "Personal Guarantees").  Mr. Scutieri signed the Personal Guarantees on his own behalf, and signed the Original Notes on behalf of Sundale as president of its general partner

---

[3]  The following table summarizes the notes issued to Sundale:

| Principal Amount of Note | Date Signed |
| --- | --- |
| $200,000.00 | 7/30/1999 |
| $300,000.00 | 8/06/1999 |
| $300,000.00 | 9/10/1999 |
| $200,000.00 | 9/30/1999 |
| $300,000.00 | 10/05/1999 |
| $150,000.00 | 10/25/1999 |
| $150,000.00 | 11/10/1999 |
| $100,000.00 | 11/11/1999 |

Kendale Capital, Inc.  (*See* Exhibits A1 through A14, 81 and 82; *see also* PS Trial Testimony generally at pgs. 487 through 520 (acknowledging each advance)).  Mr. Inglis testified that he never funded without documents, however, sometimes he did fund on faxed signatures.  (MI Trial Testimony at pg. 1292:3-16).

On November 29, 1999, the Original Notes and Personal Guarantees were replaced by a $2,000,000 renewal promissory note (the "November 1999 Note")[4].  (*See* Exhibit B1).  As part of the November 29, 1999 transactions, Mr. Scutieri was released from his personal guarantees, and instead, as part of the transaction evidenced by the November 1999 Note, FACE and Sundale entered into a mortgage and security agreement (the "November 1999 Mortgage and Security Agreement") which secured repayment of the November 1999 Note.  (*See* Exhibit B2). The property subject to the November 1999 Mortgage and Security Agreement was the Sundale Property owned by Sundale on which the Hotel Project was located and certain adjacent property owned by Mr. Scutieri as Trustee (the "Trustee Parcel").  (*See Id.*; *see also* PS Trial Testimony at pgs. 539:14 – 540:7).  The Matsuda Lien and the Simmons Lien were resolved and removed from the Sundale Property prior to the execution of the November 1999 Mortgage and Security Agreement.  (PS Trial Testimony at pg. 882:2-16).

On November 29, 1999, in conjunction with the closing of the November 1999 Note and the November 1999 Mortgage and Security Agreement, the law firm of Ruden, McClosky, Smith, Schuster & Russell, P.A. ("Ruden McClosky") issued an opinion letter (the "November 1999 Opinion Letter") opining, among other things, to the validity and enforceability of the November 1999 Note and the November 1999 Mortgage and Security Agreement.  (*See* Exhibit B9).

---

[4]  In addition to consolidating the Original Notes totaling $1,700,000, Sundale received an additional advance of $300,000.00. (*See* PS Trial Testimony at Pg. 541:1-10)

After the execution of the November 1999 Note, Mr. Scutieri continued to demand additional funding, with which demands, occasionally only after threats, FACE complied.  And so, beginning on December 17, 1999 with an advance of $500,000, FACE made seven additional advances totaling an additional $5,300,000.00.  (*See* Exhibits C1 through C57).  Some of these advances were evidenced by a note personally guaranteed by Mr. Scutieri, while other notes were secured by a mortgage and security agreement.  In connection with at least two transactions for which a mortgage and security agreement were signed, the law firm of Ruden McCluskey issued an opinion letter, opining, *inter alia*, to the validity and enforceability of the applicable note and mortgage and security agreement.  (*See* Exhibit C21 and Exhibit C50).  In total, following the November 1999 Mortgage and Security Agreement, Sundale executed an additional seven notes.[5]

Between July 30, 1999 and March 22, 2000, FACE loaned Sundale a total of seven million three hundred thousand dollars ($7,300,000.00) (the "FACE Loans"), all of which was ultimately secured by the Sundale Property and the Trustee Parcel.  However, Sundale never made a payment of any of its obligations to FACE under this original series of notes.

---

[5] Sundale signed a note on February 18, 2000 for $1,000,000.00 and a note on March 1, 2000 for $1,500,000.00. These notes were restated in the March 10, 2000 Note of $2,500,000. The following chart summarizes these notes:

| Principal Amount of Note | Date Signed |
|---|---|
| $500,000.00 | 12/17/1999 |
| $500,000.00 | 1/18/2000 |
| $500,000.00 | 1/24/2000 |
| $500,000.00 | 2/02/2000 |
| $2,500,000.00 | 3/10/2000 |
| $800,000.00 | 3/22/2000 |

Beginning in November of 1999, FACE forwarded several potential funding sources to Mr. Scutieri including Mercury Capital and Andy Kurtz. (PS Trial Testimony at pgs. 529:22 – 530:3). At the same time, Mr. Scutieri was speaking to various funding sources, including Northern Trust Bank. (*Id.* at 526:13-16), although Mr. Scutieri claimed he wasn't looking for funding until FACE stopped funding because he expected the money from FACE to continue in accordance with the promise from the Airport Meeting. (PS Trial Testimony at pg. 618:14-20).

On March 28, 2000, Mr. Inglis sent a letter to Mr. Scutieri (the "March 28th Letter") informing him that FACE would not provide any additional funding for the Hotel Project. (See Exhibit 189). When FACE stopped funding in March of 2000, Mr. Scutieri wrote several nasty letters to David Roy and to Mr. Inglis. (PS Trial Testimony at pgs. 627:17 – 630:17; *see also* Exhibits 204 and 289). By April 2000 work on the Hotel Project stopped, due, according to Mr. Scutieri, to lack of funding. (PS Trial Testimony at pgs. 632:13-633:2).

Mr. Scutieri apparently continued to look for financing because in March of 2001 Mr. Stankee advised Mr. Inglis that Ocean Bank had agreed to provide financing for the Hotel Project. (*See* Exhibit 260). Mr. Stankee's transmittal letter included a commitment letter from Ocean Bank, which commitment letter reflected Ocean Bank was willing to provide Sundale with a $10,000,000 loan, secured by a first lien mortgage on the Sundale Property. This would, of course, require FACE to subordinate its first lien position to Ocean Bank. As consideration for that subordination, the Ocean Bank March letter proposed that of the $10,000,000 Ocean Bank loan, $1,000,000 would be used to pay down the debt to FACE and $3,600,000 of the loan proceeds would be paid to Mr. Scutieri to reimburse him for his investment in the Hotel Project. $2,000,000 of the $3,600.000 would be paid to Mr. Scutieri only after the completion of the

renovations and the opening of the Hotel Project, subject to certain additional conditions outlined in the letter.  (See Exhibit 256).

The commitment letter also required that Sundale post, as additional security for the loan, a letter of credit in the amount of $1million.  In Mr. Stankee's letter to Mr. Inglis, Mr. Stankee advised that Mr. Scutieri wanted FACE to put up the $1,000,000 letter of credit.  Mr. Scutieri also proposed to pay FACE an additional $1,000,000 when he received the $2,000,000.  Not surprisingly, FACE was unwilling to agree to subordinate on the terms Mr. Stankee proposed.  There were negotiations back and forth between and among FACE, Sundale, Mr. Scutieri and Ocean Bank but no deal was reached.

On May 25, 2001 Mr. Scutieri wrote a lengthy letter to Mike Inglis (Exhibit 289) outlining a history of the loans with FACE and including the following allegations and statements.

     a.     The funding was merely a disguised loan;

     b.     The funding was coming from Mr. Chambers' trust fund even though Mr. Scutieri had been led to believe the funds were coming from some other source and that funding was cutoff when Mr. Scutieri found out he was being lied to about the funding source;

     c.     That the funding was "to settle this thing" regarding Mr. Scutieri's family and his father's estate;

     d.     That after the funding stopped Mr. Scutieri's phones were tapped and conversations taped, that his and his mother's accounts were being monitored and that his home and office were broken into; and

    e.      that Mr. Chambers was interfering with his [Mr. Scutieri] getting a deal done with Ocean Bank.

On June 19, 2001, Sundale, Kendale Capital Inc. (Sundale's general partner), Mr. Scutieri individually and as trustee, and Mrs. Scutieri filed a complaint in the District Court of for the Southern District of Florida against FACE, Mr. Chambers, Mr. Adubato, the Amelior Foundation, David Roy and Kurt Borowsky (the "2001 Complaint"). The allegations of the 2001 Complaint start with the Airport Meeting and the $10,000,000, claiming that this funding, while appearing to be a loan, would be cancelled. The 2001 Complaint laid out the allegations relating to Mr. Scutieri Sr.'s estate, and Mr. Chamber's alleged use of estate assets to build his fortune. The 2001 Complaint also alleged that the source of the FACE funding was concealed and that this concealment, as well as the apparent intent to collect the debt, contrary to what was promised, constituted material false representations.[6] However, the 2001 Complaint was never served on FACE and FACE did not learn about the 2001 Complaint until several years later. The 2001 Complaint was dismissed in November, 2001. (PS Trial Testimony at pg. 981:5-7).

### The Ocean Bank Closing

After several months of negotiations by and amongst Sundale, FACE, Mr. Scutieri and Ocean Bank, on September 7, 2001, Sundale closed a $12,000,000 loan with Ocean Bank (the "Ocean Bank Closing"). (*See* Exhibits D30, D36, and D59). The FACE Loan was reduced from $6,300,000 million to $3,250,000 represented by three renewal notes executed by Sundale in favor of FACE (the "Renewal Notes"). FACE agreed to subordinate its lien to the lien of Ocean Bank with respect to the remaining indebtedness. In connection with the Ocean Bank Closing,

---

[6]  The counts of the complaint were Breach of Oral Contract, Third Party Beneficiary, Declaratory Judgment for Cancellation of Mortgage (several counts relating to each secured note), Fraud in the Inducement (also several counts), Breach of Fiduciary Duty, Participation in a Breach of Trust, Conversion, Resulting Trust, Constructive Trust, Fraud and Tortious Interference.

Sundale, FACE, Ocean Bank, Mr. Scutieri as president and director of Kendale Capital, Inc., counsel for the various parties, as well as others signed a variety of documents, including a Modification Agreement, the Second Modification Agreement and the Third Modification Agreement (collectively, the "Modification Agreements"), on September 7, 2001 which were signed by Sundale and FACE.  (*See* Exhibits 329, 330, and 331).  The Modification Agreements contain specific and unambiguous provisions that acknowledge the continuing indebtedness represented by the Renewal Notes, as well as reaffirmation of the previous loan documents that had been executed by Sundale and Mr. Scutieri, in connection with the existing FACE loans, and acknowledgement that the terms and conditions of the previously executed loan documents remain in full force and effect except as modified by the Modification Agreements.  Most significantly, the Modification Agreements formally memorialized the agreements reached between and among Sundale, FACE and Mr. Scutieri in which Sundale and Mr. Scutieri specifically and unequivocally granted a full and complete "release and discharge" to FACE and Mr. Inglis for "any and all manner of liabilities or claims that may exist."  (These provisions will be referred to collectively as the "Release and Reaffirmation").  Mr. Scutieri testified he knew the Modification Agreements contained release provisions.  (PS Trial Testimony at pg. 1017:2-6).  The Modification Agreements, Renewal Notes and all other documents signed by Sundale, Mr. Scutieri and their affiliates and counsel in connection with the Ocean Bank Closing will be referred to collectively as the "Ocean Bank Loan Documents."

In connection with the Ocean Bank Closing and once again on behalf of Sundale and Mr. Scutieri, the Ruden McClosky law firm issued an opinion letter dated September, 2001 (Exhibit D40) that opined to the following:

> The Documents [including the Renewal Notes and Modification Agreements] have been duly and validly executed by Kendall Resort, Grand Main, Sundale and

Kendale Capital and constitute the valid and binding obligations of Kendall Resort, Grand Main, Sundale, enforceable against Kendall Resort, Grand Main, Sundale and Kendall Capital in accordance with their respective terms.

At the time Ruden McClosky issued the September 7 opinion letter, Mr. Stankee had read the May 25 letter and testified that he had no concern about his firm issuing the September 7 opinion letter.  (Trial Testimony of Glen Stankee at pgs. 209:24-10:2, hereinafter "GS Trial Testimony at pg.____.").  When asked whether he would have allowed the Ocean Bank Closing to take place if he had any doubt regarding the validity of the FACE loans, Mr. Stankee testified "no."  (*Id.* at 234:10-18).

Pursuant to the Renewal Notes, Sundale was obligated to make quarterly  interest payments until November 29, 2002 and then monthly interest payments starting in December 29, 2002; all principal and unpaid interest were due to be paid on November 29, 2004.  Sundale made all interest payments due under the Renewal Notes timely from the time of the Ocean Bank Closing until May 2005.  (*See* PS Trial Testimony at pg. 1097:3-16; *see also* Exhibits 337 through 349).  In November 2004 Mr. Scutieri asked Michael Inglis to extend the maturity date of the FACE loan because Mr. Scutieri was in the process of obtaining additional financing from Ocean Bank to pay off his obligations to FACE.  (MI Trial Testimony at pg. 1285:14-25).  Mr. Inglis agreed to the extension and Sundale made additional interest payments, until May 2005 when no further payments were made.

Notwithstanding that Sundale stopped making payments to FACE in May 2005, FACE did not take any steps to collect the debt.  Mr. Inglis testified that FACE did not pursue its remedies under its loan documents during this time period because FACE did not want to take over the Hotel subject to the Ocean Bank Loan.  (MI Trial Testimony at pg. 1304:10-22).  Moreover, FACE had no desire to operate the Hotel.  (*Id.* at 1307:15-16).  Mr. Inglis also

testified that FACE didn't want to take any steps that would "inspire" Mr. Scutieri to file a lawsuit.  (*Id.* at 1307:17-22).  Finally, Mr. Inglis testified that FACE didn't want to foreclose because of the fundamental fact that Mr. Chambers was a friend of the Scutieri family and wanted to assist in the Hotel Project.  (*Id.* at pgs. 1302:14 – 1303:2, 1307:23 – 1308:1).

On December 11, 2007, Ocean Bank advised Sundale that Sundale was in default of its obligations to Ocean Bank.[7]  On December 11, 2007, FACE sent its default notice to Sundale. Sundale filed for protection under Chapter 11 of the United States Bankruptcy Code on December 12, 2007 (the "Petition Date").  KHS filed its own Chapter 11 petition on January 30, 2008 after receiving a default notice from the hotel licensor, Holiday Hospital Franchising, Inc.

After a very contentious bankruptcy case[8] the Debtors filed a Second Amended Chapter 11 Plan of Reorganization (the "Plan"), which Plan was confirmed on May 26, 2009 (the "Confirmation Order").  The Confirmation Order contemplates certain payments to FACE as therein provided until this adversary proceeding is resolved.

## THE PROCEDURAL HISTORY OF THIS ADVERSARY PROCEEDING

From the inception of the bankruptcy Sundale has contended that the FACE loan is not a "real" loan but delayed filing an adversary proceeding while counsel for the Debtors did some pre-filing due diligence.  FACE elected to initiate this adversary proceeding by filing a two count complaint on May 1, 2008 seeking a determination of the extent, validity and priority of its asserted lien on the Sundale Property.[9]  After some false starts, and this Court's dismissal of at least the first round of affirmative defenses, the parties went to trial on the Complaint and the Counterplaintiffs' Third Amended Answer, Affirmative Defenses and Counterclaims.    At   the

---

[7]  For details on that dispute, *see Sundale, Ltd. v. Ocean Bank*, Adversary Case No. 09-1914, United States Bankruptcy Court, Southern District of Florida.
[8]  *See, e.g.*, Amended Order Denying Creditors' Motion to Appoint a Chapter 11 Trustee or in the Alternative an Examiner (DE #963).
[9]  The second count, for substantive consolidation, was rendered moot by the Confirmation Order which confirmed the Plan that provided for substantive consolidation of the two debtors.

close of trial FACE stated it would move for judgment on partial findings pursuant to Federal Rule of Bankruptcy Procedure 7052, and, in fact, on January 4, 2010 FACE did file a motion for judgment on partial findings.

The central issue raised by the Plaintiff in the Complaint, and the issue to which the Defendants' affirmative defenses and counterclaims relate, is whether FACE is entitled to a judgment declaring that FACE holds a valid, perfected secured claim against the property owned by Sundale. See Complaint (DE #1). The Defendants raise several defenses to the enforceability of FACE's secured claim, and seek a judgment on their counterclaim declaring that FACE does not hold a valid, perfected secured claim against the subject property. See, Third Amended Answer (DE #296). Furthermore, the Defendants seek affirmative recovery from the Plaintiff by virtue of a counterclaim sounding in recoupment. *See Id.*

To determine the issues raised, this Court must determine whether or not the Release and Reaffirmation are valid and binding against the Defendants. The Plaintiff asserts that, by virtue of the Release and Reaffirmation, a full and complete "release and discharge" was given to FACE and Mr. Inglis from Sundale, after considerable negotiations, for "any and all manner of liabilities or claims that may exist" in connection with the Modification Agreements. The Defendants argue the Release and Reaffirmation were fraudulently obtained and only signed by Defendants under duress.

For the reasons stated herein, I find that the Plaintiff overwhelmingly established a prima facie case that it holds a valid, perfected lien against the Sundale Property and the Trustee Property. Conversely, the Defendants failed to meet their burden of proof in every respect with regard to their affirmative defenses and their counterclaims.

**EXTENT, VALIDITY AND PRIORITY OF THE FACE LOAN AND LIENS**

Each of FACE and the Defendants/Counterplaintiffs has sought a determination regarding the extent, validity and priority of the FACE liens.  The party bearing the burden of proof must demonstrate that it is entitled to judgment in its favor by a preponderance of the evidence.  *In re Covenant at South Hills, Inc.*, 410 B.R. 426 (Bankr. W.D. Pa. 2009).  Thus, as both parties have sought affirmative relief on this issue, I must determine in whose favor the greater weight of the evidence rests.

The loan documents that govern this dispute are those executed by the parties in September of 2001.  These documents modified, and in some instances replaced, the loan documents between Sundale and FACE that existed prior to the Ocean Bank Closing. However, even if the pre-Ocean Bank closing documents have any relevancy to these proceedings, there is no dispute that Sundale and Mr. Scutieri signed every document that supports the lien asserted by FACE.  The parties have stipulated that Mr. Scutieri executed the Renewal Notes and the Modification Agreements and that the Modification Agreements were correctly recorded. (Bilateral Pretrial Stipulation, DE #396).  Thus, FACE has met its initial burden under Count I of the Complaint proving, that its liens are enforceable, and are prior to all other liens with the exception of the Ocean Bank lien, to which lien FACE expressly subordinated.  FACE, having met its initial burden, the burden then shifted to Sundale to prove that, notwithstanding the facial enforceability of the FACE liens, the liens are nonetheless unenforceable.

### The Defendants' Affirmative Defenses

Sundale claims nine affirmative defenses – Promissory Estoppel, Unclean Hands, Waiver, Fraudulent Inducement (both defenses), Duress, Fraudulent Misrepresentation, Failure of Consideration, Fraudulent Inducement, and Equitable Estoppel.

The affirmative defenses of promissory estoppel, unclean hands, fraudulent inducement, fraudulent misrepresentation and equitable estoppel are all based on Sundale's allegations that all the FACE Loans were only disguised as loans, that Mr. Scutieri was told he would never have to pay back the loans, that Mr. Roy and Mr. Inglis lied to Mr. Scutieri about the source of the funds lent to Sundale, and that the taint of these falsehoods extended to the Release and Reaffirmation.

Sundale has failed to meet its burden with respect to any of the affirmative defenses it has raised in defense of Count I of the Complaint.

### A.  <u>Sundale Has Failed to meet its burden with respect to Fraud-Based Affirmative Defenses</u>

Sundale must prove it is entitled to its fraud-based affirmative defenses by clear and convincing evidence.  *Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1291 (S.D. Fla. 2007); *In re Fulks,* 343 B.R. 701, 708 (Bankr. M.D. Fla. 2006).  Sundale claims the FACE Loans are "null and void" or "void and unenforceable" based on three fraud-based defenses:  (i) in its Fourth Affirmative Defense, Sundale claims to have been fraudulently induced to enter into the FACE Loans (DE # 296, ¶¶ 95–100); (ii) in its Eighth Affirmative Defense, Sundale claims to have been fraudulently induced to execute the FACE Loan documents, including the release and reaffirmation documents which were executed in connection with the Ocean Bank Loan Documents (DE # 296, ¶¶ 110-15); and (iii) in its Sixth Affirmative Defense, Sundale raises fraudulent misrepresentation as an affirmative defense to the FACE Loans, based on the alleged agreement that Mr. Chambers would pay Sundale $10 million dollars as a part of a much larger repayment, which funding was purportedly to be disguised as a loan (DE # 296, ¶¶ 102-07).

i)    ***Sundale Has Failed to Meet its Burden of Proof With Respect to all Fraud-Based Defenses***

Fraud is never presumed.  *Florida East Coast Ry. Co. v. Thompson*, 111 So. 525, 527 (Fla. 1927).  "[Fraud] must be established by the evidence, and the burden is upon him who asserts it."  *Id.*  "The rule is that frauds and misrepresentations, insofar as rescission is concerned, are never presumed and must be established by clear and convincing proof." *Scocozzo v. General Dev. Corp.*, 191 So. 2d 572, 578 (Fla. 4th DCA 1966).  A party seeking relief based on fraud must prove the following -

> (1) a misrepresentation of a material fact;
> (2) that the representor of the misrepresentation knew or should have known of the statement's falsity;
> (3) the representor intends that the representation will induce another to rely and act on the misrepresentation; and
> (4) resulting injury to the party acting in justifiable reliance on the representation.

*Pulte Home Corp. v. Osmose Wood Preserving, Inc*., 60 F.3d 734, 742 (11th Cir. 1995) (relying on *Lou Bachrodt Chevrolet, Inc. v. Savage,* 570 So. 2d 306, 308 (Fla. 4th DCA 1990) and holding that party failed to prove its fraudulent inducement claim).  Sundale has failed to prove any fraud-based claim by failing to prove by clear and convincing evidence (or even by a preponderance of the evidence) any of the required elements.

Sundale has failed to prove that any material fact was misrepresented.  As I stated above, I find the credibility of virtually all of the witnesses to be highly questionable, so I must look at the objective undisputed facts.  The objective undisputed facts are that Mr. Chambers made some kind of promise to Mrs. Scutieri to provide some amount of financial assistance to Mr. Scutieri in connection with his Hotel Project.  The objective undisputed facts are that almost immediately funding was made available to Mr. Scutieri, but only when promissory notes and personal

guarantees were signed, and later when promissory notes and mortgages or future advance agreements were signed.

Mr. Scutieri is a sophisticated businessman who has owned real estate and made investments for well over thirty years.  (PS Trial Testimony at pgs. 1071:19-1072:8).  It is simply not believable that Mr. Scutieri would sign promissory notes, personal guarantees and mortgage documents encumbering, collectively, his largest asset, based on an oral statement by a man Mr. Scutieri accused of defrauding his mother, contemplating that the loan would never have to be repaid.  Moreover, the objective facts contradict this claim.  Indeed, every action Sundale and Mr. Scutieri took both before and after the Ocean Bank Closing, except for the May 25th letter and the 2001 Complaint, treat the FACE Loans as true loans.  For example, Sundale deducted the interest expense for the FACE Loans on its tax returns.  (*See generally* Earl Wald Trial Testimony, hereinafter "EW Trial Testimony at pg. ___".).  Moreover, Sundale and Mr. Scutieri had an agreement with Ms. Simmons (*see* Exhibits S6 and S16) that provided that Ms. Simmons was entitled to a share of the net profits of the Hotel Project.  For purposes of determining net profits, the obligations to FACE were carved out-  "[o]perating expenses shall also include interest paid on (1) financing agreements with Ocean Bank; (2) mortgages to Ocean Bank, F.A.C.E. and any other future mortgage holder . . ."  (See Exhibit S16) .  As I already noted, the evidence shows Mr. Scutieri looked for additional funding beginning in November 1999 although he claims he did not really make a serious attempt to do so because he did not think he needed to.  Finally, after the Ocean Bank Closing, Sundale and Mr. Scutieri made all the payments due on the Renewal Notes until after they had matured.  At no time following the

Ocean Bank Closing, and until 2008, did Sundale or Mr. Scutieri take any action to disavow the FACE Loans.[10]

Moreover, it is completely implausible that, if Mr. Scutieri and Mrs. Scutieri really believed that Mr. Chambers owed them $420,000,000 that they, at no time from 1997 until approximately 2008 would take no action to collect that obligation other than pushing on the refinance issues in the spring of 2001, which resulted in the unserved 2001 Complaint. Thus, I find that Sundale has failed to meet its burden to show that Mr. Chambers promised to give $10,000,000 towards Mr. Scutieri's Hotel Project, as a down payment on the greater obligation, which funding would be disguised as a loan.

However, even if I were to find that there had been a misrepresentation upon which Mr. Scutieri relied by signing the original FACE Loan Documents, I find that any such reliance was not reasonable[11], and does not extend to execution of the Renewal Notes or Modification Agreements or other Ocean Bank Loan Documents, because before those documents were signed Mr. Scutieri, and, ergo, Sundale, knew about the alleged misrepresentations and nonetheless proceeded with the Ocean Bank closing.[12]

---

[10]FACE correctly argues that even if the Release and Reaffirmation were unenforceable, Sundale's payments on the Renewal Notes and its failure to take any actions to dispute its obligations other than the unserved 2001 Complaint constitute a waiver of any such claims. *See Miracle Center Assocs. v. Scandinavian Health Spa, Inc.*, 889 So. 2d 877, 878 (Fla. 3d DCA 2004).

[11]  I reject as completely implausible Mr. Scutieri's argument that his belief that the $10,000,000 would not need to be repaid was reasonable because in early talks to resolve this feud, Mr. Chambers offered to make a $200,000 charitable donation in memory of Mr. Scutieri's deceased daughters.

[12] Mr. Scutieri and Sundale make much of the fact that Mr. Roy and Mr. Inglis lied to him about the source of the funds, that the source of funds were from a group of unnamed investors rather than from Mr. Chambers or his trusts. Mr. Roy claims Mr. Scutieri knew all along the funds were from the trusts while, at the same time, conceding he lied to Mr. Scutieri. (DR Trial Testimony at pg. 123:1-9). Mr. Inglis agreed he was not forthright with Mr. Scutieri and, in fact, prepared an indemnification letter, which Mr. Roy signed on behalf of VBM, relating to the "possible mischaracterization" of the funding source. According to the Defendants, Mr. Inglis' indemnification letter is the smoking gun that unequivocally demonstrates that FACE, VBM and Mr. Roy and, by extension therefore, Mr. Chambers, intended to defraud Mr. Scutieri. Equally believable is Mr. Roy's testimony that he lied to Mr. Scutieri to insulate Mr. Chambers from Mr. Scutieri (*id.* at pgs. 110:14-16; 123:1-9) as Mr. Chambers had testified he thought Mr. Scutieri was "toxic" and that he did not want to "ever have anything to do" with him (RC Trial Testimony at pg. 74:12-18). Indeed, once Mr. Chambers made his initial call to Mr. Roy after the Airport Meeting, he had virtually no involvement in these transactions. However, assuming this misrepresentation is at all relevant to

*First*, at the time of its execution of the Ocean Bank Loan Documents, Mr. Scutieri, on behalf of Sundale, was a sophisticated and experienced business man who was represented by competent legal counsel.[13]  *Second*, it is undisputed that, prior to the time Sundale executed the Ocean Bank Loan Documents:

(i)      Sundale had accused FACE of fraudulently inducing it into the purported "bogus" loans through the May 25th Letter and the 2001 Complaint;

(ii)     Sundale had accused FACE in the May 25th Letter of not fully funding an amount it had allegedly agreed to pay Sundale**;**

(iii)    Sundale, through Scutieri, was accusing FACE's principal and affiliates of crimes of theft, conversion and illegal wiretapping, among other things, through the May 25th Letter**;**

(iv)     Sundale had threatened to sue FACE for the alleged wrongs through the May 25th Letter; and

(v)      Sundale in fact, sued FACE for the alleged wrongs through the filing of the 2001 Complaint, alleging, among other things, fraud, including the allegations that the funding was merely disguised as a loan.

Thus, when the Ocean Bank Closing Documents, including the Release and Reaffirmation were signed, Mr. Scutieri could not have relied on the alleged misrepresentations or have been induced by the alleged misrepresentations to execute the Ocean Bank Loan Documents because he already knew about the alleged misrepresentations.

Moreover, at the time Sundale executed the Ocean Bank Loan Documents, FACE and Sundale were deeply embroiled in a contentious and adversarial relationship, described in part by Mr. Scutieri's allegations contained in the May 25th Letter.  (*See* Exhibit E46).  At trial, Mr.

---

the issue of whether Mr. Scutieri was promised $10,000,000 "disguised as a loan," the Defendants' arguments are inconsistent.  If the source of the funds were unnamed investors and Mr. Scutieri expected Mr. Chambers to make good on the debt for him (*see* PS Trial Testimony at pg. 481:2-12) then the original FACE Loan Documents were not sham documents, they were real loan documents that someone else would pay.  Alternatively, if the funding was merely "disguised as a loan" because the trusts could not make loans, as Mr. Roy admitted he told Mr. Scutieri (*see* DR Trial Testimony at pg. 123:1-4), then it is not logical that Mr. Scutieri believed the funds were coming from anywhere other than the trusts.

[13] Discussed, *supra.*

Scutieri elaborated on some of the allegations contained within the May 25th Letter, further evidencing the acrimonious nature of the relationship between the parties prior to the execution of the Ocean Bank Loan Documents.  (*See generally* PS Trial Testimony at pgs. 1072-77).

Any reliance on misrepresentations or omissions by an opposing party in the context of a contentious and adversarial relationship is unreasonable as a matter of law.  *Mergens v. Dreyfoos*, 166 F.3d 1114, 1118 - 19 (11th Cir. 1999); *Pettinelli v. Danzig*, 722 F.2d 706, 710 (11th Cir. 1984); *Somerset Pharms., Inc. v. Kimball,* 49 F. Supp. 2d 1335, 1340 (M.D. Fla. 1999).   In *Mergens*, a case similar to this case, prior to the execution of a general release, the releasing party had accused the released party of fraud and other wrongdoing and had threatened suit.  "A more untrusting relationship is difficult to imagine."  *Mergens*, 166 F.3d at 1118.  The Eleventh Circuit held that reliance on any misrepresentations made by the releasing parties' adversary was therefore unjustified as a matter of law.  *Id.* at 1118-19.  The *Mergens* court further reasoned that the releasing parties were unjustified in relying on their adversaries' misrepresentations because the releasing parties "were sophisticated sellers, represented by both legal counsel and certified public accountants."  *Id*. at 1118.

As a matter of law, therefore, Sundale has failed to demonstrate reasonable reliance on any alleged misrepresentations by FACE at the time Sundale executed the Ocean Bank Loan Documents.  The Ocean Bank Loan Documents, which included the Renewal Notes, were executed at a time when the 2001 Complaint was still pending in federal district court, and at a time when the allegation-laden May 25th letter was less than four months old.  Certainly, the allegations contained in the May 25th letter did not exhibit a confidence by Mr. Scutieri in the trustworthiness of FACE or its members.

Moreover, Sundale is estopped from raising, or has waived, any of claim to fraud, whether by affirmative defense or as a basis for an affirmative claim.

> It is recognized that under the doctrine of equitable estoppel a party with full knowledge of the facts, which accepts the benefits of a transaction, contract, statute, regulation, or order may not subsequently take an inconsistent position to avoid the corresponding obligations or effects.

*Kaneb Servs., Inc. v. Federal Sav. & Loan Ins. Corp.*, 650 F.2d 78, 81 (5th Cir. Unit A July 1981) (citing among others, *Exchange Trust Drainage Co. v. Drainage Dist*., 278 U.S. 421 (1929)); *see also Lipkin v. Bonita Garden Apartments Inc.,* 122 So. 2d 623, 624 (Fla. 3d DCA 1960) (holding lessees were estopped to contend a lease was invalid because they accepted the lease, took possession and occupancy of the apartment, occupied a second apartment under the same terms and conditions stipulated in the lease, and made rental payments under the terms of the lease).  Sundale is estopped from claiming fraud with respect to the FACE Loans because Sundale knowingly accepted the benefits of the alleged "bogus" loans when it negotiated the Ocean Bank loan and the modification of the FACE Loans.[14]  Based on FACE's subordination of its first position mortgage, Sundale was able to close the $12,000,000 Ocean Bank loan.  FACE's subordination of its first mortgage position provided a tangible benefit to Sundale.  S*ee, e.g*., *Head v Lane*, 495 So. 2d 821, 824 (Fla. 4th DCA 1986) (holding a party is estopped from attempting to repudiate the obligations and validity of a transaction after accepting the benefits resulting from it).  Sundale, having received a benefit from FACE's actions in connection with the Ocean Bank Closing, cannot now seek to "unscramble the egg."

---

[14] I am not addressing here Sundale's initial acceptance of the funds but rather what occurred as part of the Ocean Bank Closing.

### (ii)    Sundale Renewed and Reaffirmed
### the FACE Loans in 2001

Sundale is further estopped from arguing the validity of the FACE Loans, because there is no dispute that whatever Mr. Scutieri claims to have been his understanding regarding a bogus loan, a disguised loan, or a loan that would never need to be repaid, by September 7, 2001, Mr. Scutieri knew the facts and circumstances relating to the alleged fraudulent misrepresentations and inducement now claimed and expressly and unequivocally renewed those loans nonetheless.

The Defendants have not alleged, nor is there evidence, that between June 25, 2001 and September 7, 2001 FACE or any of its affiliates took any additional fraudulent actions that would modify Mr. Scutieri's knowledge or create a further basis for the fraud allegations other than those set forth in the 2001 Complaint and the May 25th letter.

> One who gives a note in renewal of another note, with knowledge at the time of a partial failure of the consideration for the original note, or false representations by the payee, etc., waives such defense, and cannot set it up to defeat a recovery on the renewal note; and where one giving such renewal note either had knowledge of such facts and circumstances, or by the exercise of ordinary diligence could have discovered them and ascertained his rights, it became his duty to make such inquiry and investigation before executing the renewal note, and if he fails to do so he is as much bound as if he had actual knowledge thereof.

*Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 522 (Fla. 3d DCA 1994) (quoting *Storrs v. Storrs*, 178 So. 841, 845 (Fla. 1937)); *accord Hurner v. Mutual Bankers Corp.*, 191 So. 831, 833 (Fla. 1939).  In *Hurner*, the Florida Supreme Court refused to allow a borrower to defeat a loan based on alleged misrepresentations made at the time the loan was originally made and again at the borrower's renewal of the loan:

> …there is no difference in the case of a waiver of the defense of fraud by the giving of a renewal note where there had been ample time and opportunity to discover the fraud beforehand and in the case where the fraud perpetrated in the first instance is simply restated at the time the renewal note was given, where there had been likewise sufficient time and opportunity for the maker to have uncovered the truth or falsity of the representations of the agent of the payee.

*Id*. at 833-34; *see also Storrs*, 178 So. 841 (holding a defendant could not defend a promissory note for – or seek recoupment from – an allegedly fraudulent loan when it subsequently issued a renewal note and paid interest thereunder).   As a matter of law, Sundale's renewal of the FACE Loans on September 7, 2001 bars any fraud based defenses to the validity of the FACE Loans.

### iii) *Sundale's General Releases Executed In Favor Of FACE in 2001 Released Any Fraud-Based Defenses*

Finally, Sundale and Mr. Scutieri released FACE and Mr. Inglis[15] from any claims that they had on the date the release was executed, which release includes any claims arising from these alleged misrepresentations.  The release language is very broad.

> Mortgagor [Sundale and Mr. Scutieri, individually and as trustee] and each of them hereby forever compromise, RELEASE AND DISCHARGE Mortgagee [FACE] and its Manager, Michael K. Inglis (herein 'Released Parties') of and from any and all manner of liabilities or claims that may exist, whether known or unknown, suspected or unsuspected, in favor of Mortgagor or either of them. Mortgagor, and each of them, agrees that the release extends to all claims of every kind and nature, known or unknown, suspected or unsuspected, which each may have against Released Parties.

(Ex. D44).

### B. Sundale Cannot Prevail on its Affirmative Defense of Duress

Sundale alleges that its 2001 written reaffirmation of the FACE Loans, waiver of any defenses to the FACE Loans, and general release of FACE are not binding because Sundale entered into the Ocean Bank Loan Documents "as a result of duress and not out of free will or voluntarily."  (DE #296, ¶ 101).  In support of its defense of duress, Sundale argues that absent FACE's agreement to subordinate its secured debt to Ocean Bank, Sundale could not obtain the Ocean Bank Loan and therefore could not complete the Hotel Project and that Sundale had no other source of funding.

---

[15] Mr. Inglis is not a party to this adversary proceeding so I will not address the validity of any release of Mr. Inglis.

"The burden of proof to show duress or coercion in the execution of a legal instrument lies with the party claiming duress." *Smith v. Paul Revere Life Ins. Co.*, 998 F. Supp. 1412, 1416 (S.D. Fla. 1997). "Establishing a case of economic duress is extremely difficult. The aggrieved party must show: (1) wrongful act or threats, (2) financial distress caused by the wrongful acts or threats, and (3) absence of a reasonable alternative course of action." *Amoco Oil Co. v Gomez*, 125 F. Supp. 2d 492, 503 (S.D. Fla. 2000); *accord Humer v. Internal Revenue Serv.*, 1995 WL 366032, *4 (S.D. Fla. Feb. 17, 1995);

Sundale argues that FACE's requirement that Sundale release FACE from any potential claims and FACE's requirement that Sundale reaffirm the FACE Loans as consideration for FACE's subordination of its first priority secured position to Ocean Bank, together with Sundale's "dire" financial situation which necessitated the Ocean Bank Loan (which Sundale blames on the FACE Loans), constituted duress. (DE #296, ¶ 101). Sundale has failed to prove that it is legally entitled to assert a defense of duress and has failed to prove that it was actually under economic duress at the time of the Ocean Bank Closing.

First, FACE was legally entitled to enforce Sundale's secured debt obligations under the FACE Loan Documents, at least until such time as Sundale could prove to the contrary, and it was not inappropriate for FACE to demand consideration for its agreement to subordinate to the Ocean Bank loan; indeed, consideration is necessary to render any agreement enforceable.

> [I]t is well established that duress cannot be predicated upon a threat or the performance of an act which a person has a lawful right to perform and duress is not established merely by proof that consent was secured by the pressure of financial necessity or circumstances of the person seeking to assert it.

*Friedman v. Bache & Co.,* 321 F. Supp. 347, 350 (S.D. Fla. 1970). In *Bache*, the District Court held that Bache, the defendant, acted lawfully in liquidating plaintiff's account to discharge the

plaintiff's indebtedness to Bache, and that plaintiff therefore failed to prove Bache committed any unlawful act that deprived the plaintiff of her free will. *Id.*

In *Peralta v. Peralta Food, Corp.* 506 F. Supp. 2d 1274, 1280 (S.D. Fla. 2007), the District Court for the Southern District of Florida echoed the *Bache* court, stating that "[i]t is not improper and therefore not duress to threaten what one has a legal right to do." (quoting *City of Miami v. Kory*, 394 So. 2d 494, 498 (Fla. 3d DCA 1981)). In *Spillers v. Five Points Guar. Bank*, 335 So. 2d 851, 853 (Fla. 1st DCA 1976), the court held that a lender's requirement that its borrower execute renewal loan documents did not constitute duress because the bank did not do "anything which it did not have a legal right to do." In arriving at its decision, the court noted that "[w]hile it is true that threats to enforce legal rights may constitute duress under certain circumstances, they do not constitute duress when the threat is to enforce existent legal rights." *Id.* at 852; *see also Continental Airlines, Inc. v. Lelakis*, 943 F. Supp. 300, 307 (S.D.N.Y. 1996) ("A party's threat to take action which it is legally entitled to take is not wrongful, nor is a threat to insist upon one's legal rights.").

An entity is legally entitled to take a hard bargaining position without sacrificing its legal rights. "Mere hard bargaining positions, if lawful, and the press of financial circumstances, not caused by the (party against whom the contract is sought to be voided), will not be deemed duress." *Chouinard v. Chouinard*, 568 F.2d 430, 434 (5th Cir. 1978) (quoting *Business Incentives Co. v. Sony Corp. of Am.,* 397 F. Supp. 63, 69 (S.D.N.Y. 1975) and concluding that the subject promissory notes were not executed under duress because no wrongful act occurred).[16] The Seventh Circuit Court of Appeals stated that:

> …the mere fact that one is in a difficult bargaining position due to desperate financial circumstances does not support a defense of economic duress . . . A

---

[16] In *Bonner v Pritchard*, 661 F.2d 1206, 1207-09 (11th Cir. 1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

> borrower cannot charge a lender with economic duress where the pressures on the
> borrower are the result of his own business decisions and economic conditions.

*Resolution Trust Corp. v. Ruggiero*, 977 F.2d 309, 313 (7th Cir. 1992) (holding there was no

duress where the lender did not put the borrower in a position where he needed the money under

the terms of the promissory note).

### i) *Sundale Had Reasonable Financing Alternatives*

Sundale has failed to demonstrate that it had no source of funds other than the Ocean

Bank Loan.  At the time of the execution of the Ocean Bank Loan Documents, Sundale had

access to funds from numerous sources.  Sundale's purported financial necessity to procure the

Ocean Bank Loan was solely by reason of its own financial circumstances, which according to

the record evidence, "were neither limited nor extreme."  *Bache*, 321 F. Supp. at 350.  As the

*Ruggiero* Court explained,

> Indeed, it takes quite a bold litigant … to assert that a lender's refusal to make a
> loan unless the borrower agrees to be held responsible for its repayment equals
> economic duress!  The mere fact that a party to a contract is unable to obtain the
> terms he desires through negotiation does not mean that he can later attempt to
> avoid his obligations under the contract by claiming that he agreed to the contract
> (here, the loan note) under economic duress.

*Ruggiero*, 977 F.2d at 314.

The evidence shows that Sundale had alternatives to the execution of the Ocean Bank

Loan Documents.  First, Sundale could have prosecuted the 2001 Complaint.  If Sundale had

successfully pursued the 2001 Complaint, it would have eliminated the debt to FACE and the

mortgage.  However, it appears from the evidence that the purpose of the 2001 Complaint, along

with the May 25th Letter, was not intended to eliminate the debt, but rather, was merely a tactic

for use in connection with negotiating terms with FACE for the Ocean Bank Closing.

Moreover, the evidence shows that in the summer of 2001 Sundale and Mr. Scutieri had access to ample sources of funds and capital with which to complete the Hotel Project.  (*See* EW Dec. 7 Trial Testimony at pgs. 9:24-10:25).    Further, although Mr. Wald testified to Mr. Scutieri's financial wherewithal at the time of the Ocean Bank Closing, there are certain assets that Mr. Wald was not asked to review, indeed that Mr. Wald did not know about.  Although Mr. Wald worked with Mr. Scutieri for thirty years, he did not review any records whatsoever from Matsuda Capital, a Cayman Island entity, one of Mr. Scutieri's many companies.[17]  (*Id.* at pg. 21:4-19).  Mr. Scutieri had never even told Mr. Wald about Matsuda Capital.  *Id.*   Mr. Scutieri's failure to disclose this asset, which Mr. Scutieri clearly knew about, creates an inference that, if disclosed, the asset would have provided information adverse to Sundale's case.  *See Weeks v. ARA Servs.*, 869 F. Supp. 194, 195 (S.D.N.Y. 1994) ("Where relevant information … is in the possession or control of one party and not provided, then an adverse inference may be drawn that such information would be harmful to the party who fails to provide it.").

However, whatever the details of lesser sources of income and capital, most telling and most problematic for Sundale's affirmative defense of economic duress is Sundale's ownership of eight acres of real property adjacent to the Sundale Property (the "Back Eight Acres").[18]  At the time of the Ocean Bank Closing this property had an estimated value of between $12 and $20 million dollars, and was unencumbered.  (*See* PS Trial Testimony at pg. 811:10-24; *see also* EW Dec. 7 Trial Testimony at pg. 26:16-21).  In December of 2002, a little over one year after the Ocean Bank Closing, Mr. Scutieri negotiated and closed a $2,450,000 loan with Optimum Bank

---

[17]   Matsuda Capital is the company that held a first mortgage on the Sundale Property, according to Mr. Scutieri, for "asset protection" purposes. (PS Trial Testimony at pg. 784:10-17)        .
[18] The Back Eight Acres, also referred to throughout this case as the "South Property" is part of the overall 19 acres that make up the Sundale Property.  (*See* PS Trial Testimony at pgs. 806-811.)

secured by a mortgage on the Back Eight Acres.  (*See* EW Dec. 7 Trial Testimony at pgs. 26:19-27:1).

The evidence shows that both Mr. Scutieri and Sundale had assets sufficient to provide alternatives to seeking funding from Ocean Bank, but apparently chose not to pursue those alternatives.  To the extent those apparently viable alternatives were problematic, the burden was on Sundale to put forth such evidence, which it did not.   *See, e.g., Collins v. United States*, 532 F.2d 1344, 1349 (Ct. Cl. 1976) (holding the plaintiff was aware of alternatives and therefore could not demonstrate a defense of duress); *Amoco,* 125 F. Supp. at 503 (holding no affirmative defense of duress was established because the claimant refused to pursue alternatives, including, her refusal to sign the documents or prosecution of her claims in a court of law); *Zelman v Cook*, 616 F. Supp. 1121, 1133 (S.D. Fla. 1985) (holding no duress was established where the claimant failed to exercise its adequate alternative of filing a law suit to execute the disputed release);.

Based on the evidence I find that Sundale and Mr. Scutieri had access to funds such that Sundale's cries of economic duress ring hollow.  Accordingly, I find Sundale is not entitled to rely on the affirmative defense of economic duress.

### C.  <u>Sundale Failed To Prove Its Equitable Defenses</u>

Sundale has also failed to prove its affirmative defenses of promissory estoppel, equitable estoppel, unclean hands or waiver as defenses to its obligations under the FACE Loans.  Sundale's burden of establishing any such affirmative defenses is by clear and convincing evidence.  *See Zurich Am. Ins. Co. v. Frankel Enters*, 287 Fed. Appx. 775, 779 (11th Cir. 2008) (promissory estoppel); *West Indies Network-1, LLC v. Nortel Networks, (CALA) Inc.*, 243 Fed. Appx. 482, 485 (11th Cir. 2007) (promissory estoppel); *W.R. Grace & Co. v. Geodata Servs.,*

*Inc.,* 547 So. 2d 919, 925 *(*Fla. 1989) (promissory estoppel)*; Choctawhatchee Elec. Coop., Inc. v. Gulf Power Co.,* 265 So. 2d 417, 421 (Fla. 1st DCA 1972) (promissory estoppel and waiver).

> ### i)        *FACE is Not Estopped From Enforcing the FACE Loans*

In their third and ninth Affirmative Defenses the Defendants allege that FACE is estopped from seeking to enforce its liens or relying on the Release and Reaffirmation because Mr. Scutieri and Sundale detrimentally relied on the false promise of $10,000,000 disguised as a loan (Promissory Estoppel) and the $10,000,000 was really a partial payment of a much larger sum that was not supposed to have been repaid (equitable estoppel).

> Estoppel is applicable where by word, act, or conduct one person causes another to believe in a certain state of things and thereby induces the other person to act to his detriment.  The doctrine is applied with great caution and if the conduct is ambiguous and thus susceptible of two constructions, one of which is inconsistent with the right asserted by the party sought to be estopped, there is no estoppel.  As this court has stated, estoppel is applied 'only where to refuse it application would be virtually to sanction fraud.'  Unless the party seeking to assert the estoppel is misled, estoppel will not lie.

*Capital Bank v. Schuler*, 421 So. 2d 633, 638 (Fla. 3d DCA 1982) (internal citations omitted).

Promissory estoppel is demonstrated by "(1) a promise made by the promisor; (2) which the promisor should reasonably expect to induce action or forbearance on the part of the promisee; (3) that in fact induced such action or forbearance; and that (4) injustice can be avoided only by enforcing the promise." *West Indies*, 243 Fed. Appx. at 485.

Sundale has failed to prove it detrimentally relied on any alleged illusory promise to pay Sundale Ten Million Dollars ($10,000,000) "disguised as a loan."  FACE cannot, therefore, be barred from enforcing the FACE Loans by equitable estoppel, including the particular form of equitable estoppel known as promissory estoppel.

There is no credible evidence of any binding contractual agreement to pay Sundale $10,000,000, or any other amount.  The sole testimony presented by the Defendants as to the

alleged oral agreement of Mr. Chambers is the testimony of Mr. Scutieri's former girlfriend, Jacqueline Simmons, whose testimony was entirely disputed by Mr. Chambers. And, even if I were to believe Ms. Simmons' testimony, neither she nor Sundale has demonstrated the material terms necessary to constitute an enforceable oral agreement.

Ms. Simmons testified only that Mr. Chambers promised to provide ten million dollars, but there was no evidence of any agreement on: (1) the timing of any such payment (or of any other amounts); (2) the method of any such payment(s); (3) the specific identities of the payor and payees; or (4) most significant in its absence, the consideration for any such payment. Further, although Sundale claims there was an agreement that the payments to Sundale would be disguised as loans, there was no evidence of any such agreement or the terms of such agreement. "Whether a contract is oral or written, it is essential that the parties mutually agree upon the material terms. Mutual assent is an absolute condition precedent to the formation of a contract and without mutual assent, neither the contract nor any of its provisions come into existence." *In re Paxson Elec. Co*., 248 B.R. 451, 461 (Bankr. M.D. Fla. 2000) (*internal* citations omitted) (holding there was no meeting of the minds as to essential elements of an alleged oral agreement for profit sharing and "therefore there can be no enforceable contract").

> The creation of a contract requires that there be a mutual or reciprocal assent to a certain and definite proposition, which is commonly referred to as a 'meeting of the minds.' There is no meeting of the minds between the parties when essential terms are left open for consideration or negotiation. Thus, to create a contract and trigger contractual obligations, the parties must have a definite and distinct understanding, without which there is no assent and no contract.

*Glosser v. Vasquez*, 898 So. 2d 1179, 1181 (Fla. 3d DCA 2005) (quoting *Hewitt v. Price,* 222 So.2d 247 (Fla. 3d DCA 1969) and citing *Webster Lumber Co. v. Lincoln,* 115 So. 498, 502 (1927)). Any alleged statements of Mr. Chambers that he would "work things out" (DE #296, ¶ 24) do not constitute evidence of any agreement supported by valid consideration. *See F.M.W.*

*Props., Inc. v. Peoples First Fin. Sav. & Loan Ass'n*, 606 So. 2d 372, 376 (Fla. 1st DCA 1992) (holding that a bank officer's statement "'don't worry we'll work with you,' hardly constitutes an agreement supported by consideration and we decline to consider it as proper evidence of such"). As a matter of law, there was no meeting of the minds as to the most essential elements of any alleged oral agreement to give Sundale ten million dollars (or any other sum), and there is consequently no enforceable agreement upon which Sundale could have reasonably relied. *Grigat v. Tyco Int'l (US), Inc*., 322 Fed. Appx. 747, 748 (11th Cir. 2009) (denying claim of estoppel where there could be no reasonable reliance on conflicting statements). Moreover, as I have already found, based on the objective facts, there was no agreement to provide $10,000,000 to Sundale disguised as a loan.

All the documents executed by both Sundale and FACE concerning the FACE Loans clearly demonstrate that any monies paid to Sundale were in consideration of its agreement to repay all such sums with interest. "Estoppel rests on the premise that the party asserting the estoppel has acted in reliance upon the prior inconsistent conduct. The essence of estoppel is that person should not be permitted to unfairly assert inconsistent positions." *Pelican Island Prop. Owners Ass'n v. Murphy*, 554 So. 2d 1179, 1181 (Fla. 2d DCA 1989). As with its fraud-based defenses, Sundale must demonstrate justifiable reliance on any prior inconsistent statements or conduct. *Eclipse Med., Inc. v. American Hydro-Surgical Instruments, Inc.,* 262 F. Supp. 2d 1334, 1349-52 (S.D. Fla. 1999); *W.R. Grace*, 547 So. 2d at 924-25. In *Eclipse*, the District Court held that a party could not demonstrate justifiable reliance to support an estoppel claim based on an alleged promise that was "completely inconsistent and irreconcilable with the express terms of the parties' written Agreement." *Id*. at 1351. Further, as I previously

addressed, Sundale cannot demonstrate justifiable reliance on any alleged statements or conduct of FACE given the adversarial relationship between the principals of FACE and Sundale.

Moreover, there is no evidence of any conduct by FACE which could have otherwise misled Sundale into believing FACE would not enforce the FACE Loans.

> The defense of estoppel to foreclose a mortgage requires a clear showing of action by the mortgagee which misleads the mortgagor so that he acts in a way that he would not have acted if he had known that the mortgagee would require performance under the strict terms of the mortgage agreement.

*Lambert v. Dracos,* 403 So. 2d 481, 482 (Fla. 1st DCA 1981); *accord Tompkins v. Jim Walter Homes, Inc*., 656 So. 2d 963, 964 (Fla. 5th DCA 1995) (rejecting an estoppel defense to a loan). As a matter of law, Sundale has failed to prove its estoppel defenses because a "party cannot assert an estoppel where it did not rely upon the representations or conduct of the other party, nor was misled by such conduct." *TLZ Props. v. Kilburn-Young Asset Mgmt*., 937 F. Supp. 1573, 1582 (M.D. Fla. 1996) (striking the affirmative defense of estoppel and holding that an oral agreement for a "deed in lieu" was unenforceable for lack of mutual assent and that the lender could not have reasonably relied on any such purported agreement).

I have already found that the Release and Reaffirmation are enforceable. Accordingly, any allegations made or evidence submitted in support of promises made at the Airport Meeting, even if true, are irrelevant. I have already held that Mr. Scutieri and Sundale had full knowledge of these alleged claims, indeed had already asserted, by letter and lawsuit, these very claims, prior to September 2001 when the Release and Reaffirmation were signed. So, any claims arising from pre-September 2001 are barred by the Release and Reaffirmation. I also want to once again emphasize that I find Sundale's version of the events unbelievable. I do not for one minute believe that, if Mr. Scutieri truly believed either he or his mother was entitled to sue for

$420,000,000 that he would have settled for a "down payment" of $10,000,000, and done nothing else for ten years, or otherwise delayed pursuit of that lawsuit. It is simply not credible.

The Defendants have therefore failed to support their defense of estoppel.

<i>ii)</i>      <b><i>FACE Did Not Waive Its Rights Under the FACE Loans</i></b>

### a. Definition of Waiver

In their Third Affirmative Defense, the Defendants claim that FACE waived its rights with respect to collections of monies loaned or advanced to the Defendants because FACE "failed to demand payment from Sundale for a period of two and one half years…" (*See* Third Amended Answer, DE 296 ¶ 94).

Waiver is defined as "an intentional relinquishment or abandonment of a known right or privilege, or conduct that warrants an inference of the intentional relinquishment of a known right." *Destin Sav. Bank v. Summerhouse of FWB, Inc*., 579 So. 2d 232, 235 (Fla. 1st DCA 1991) (citing *Johnson v. Zerbst*, 304 U.S. 458 (1938)).

> In order to establish a valid waiver, the following elements must be satisfied: (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish that right, privilege, advantage or benefit.

*Destin*, 579 So. 2d at 235 (holding that by making the statement "there will be no problem" the bank did not waive its rights to accelerate the balance due under its loan documents).

The Defendants argue the fact that FACE did not demand payment during a time period of two and one half years constitutes waiver. However, a mere delay in enforcing one's rights does not constitute waiver of that right.[19] *See Graham Contracting, Inc. v. Flagler County*, 444 So. 2d 971, 972 (Fla. 5th DCA 1983) (noting that a waiver of the legal right to arbitrate should not be implied by mere inaction).

---

[19] There are times when such a delay might give rise to a claim for laches but laches neither has been alleged nor demonstrated here.

As detailed above, Mr. Inglis testified that while FACE was well aware of its rights, it opted not to institute foreclosure proceedings for several reasons.  (*See* MI Trial Testimony at pg. 1304-08).  Eventually, FACE realized that it would have to institute litigation, and therefore sent a notice of default.  (*Id.* at pg. 1279:11-21).  Not long after, Sundale filed for chapter 11 bankruptcy protection.

Pursuant to the non-waiver provisions of the Modification Agreements, any failure by FACE to pursue its remedies under the Modification Agreements did not constitute a waiver by FACE to seek payment of all sums due thereunder.  The Eleventh Circuit has held that non-waiver provisions – such as those contained in the FACE loan documents -- are enforceable in Florida.  *See MCA Television Ltd. v. Public Interest Corp.,* 171 F.3d 1265, 1270 (11th Cir. 1999*)* (citing *Philpot v. Bouchelle*, 411 So. 2d 1341 (Fla. 1st DCA 1982)); *Burger King Corp. v. Lee*, 766 F. Supp. 1149, 1156 (S.D. Fla. 1991) (same); *Eskridge v. Macklevy, Inc.,* 468 So. 2d 337, 339 (Fla. 1st DCA 1985) (upholding Florida's enforcement of anti-waiver provisions).  Moreover, I find that FACE did not act unreasonably in delaying enforcement.  *See Graham Contracting*, 444 So. 2d 971.

The Defendants failed to meet their burden of proving that FACE waived its rights under the FACE loan documents.  FACE's decision not to institute foreclosure proceedings was fully explained at trial by Mr. Inglis.  (*See* MI Trial Testimony at pgs. 1304-08).  Furthermore, when FACE did decide to pursue its rights, FACE sent the Defendants a notice of default and began the process of taking action well within the applicable statute of limitations period.[20]  Thus, the Defendants' have failed to provide their Third Affirmative Defense of waiver.

---

[20]  The statute of limitations for pursuing a suit on a promissory note or foreclosure of a mortgage is five years.  Fla. Stat. §§95.11(2)(b) & (2)(c).

### iii)    *FACE Does Not Have Unclean Hands*

Sundale also asserts the defense of unclean hands based on its claim that FACE engaged in a "fraudulent scheme" to cause Sundale to sign loan documents in connection with the promise of "$10,000,000 as a disguised loan which would never have to be repaid."  (DE #296, ¶ 90).

Because I have already found the Defendants have failed to prove any evidence of fraud, as a matter of law, Sundale cannot prove unclean hands in defense of its obligations under the FACE Loans.  *See L & L Doc's, L.L.C. v. Florida Div. of Alcoholic Beverages & Tobacco*, 882 So. 2d 512 (Fla. 4th DCA 2004) (entering judgment against defense of unclean hands where there was no proof of fraud).[21]  *Ocean View Towers, Inc. v. First Fid. Sav. & Loan Ass'n*, 521 So. 2d 325, 326 (Fla. 4th DCA 1988) (quoting *Roberts v. Roberts,* 84 So.2d 717, 720 (Fla. 1956) (internal quotation marks omitted)).  The defense of unclean hands fails.

### D.  <u>Sundale Cannot Establish Failure of Consideration</u>

As their Seventh Affirmative Defense, the Defendants assert that the Reaffirmation and Release are unenforceable based on failure of consideration.  The general law of contracts states that "[i]n the general law of contracts, want of consideration means a total lack of ___***any***___ valid consideration for a contract, failure of consideration is the neglect, refusal or failure of one of the parties to perform or furnish the consideration agreed on."  *Holm v. Woodworth,* 271 So.2d 167, 169 (Fla. 4th DCA 1972) (emphasis added).

The evidence shows that in conjunction with the execution of Ocean Bank Loan Documents, FACE agreed to subordinate its first mortgage position to that of Ocean Bank, a

---

[21] In addition, as already addressed, there is no evidence that Sundale executed the FACE Loan Documents under duress.

condition to funding imposed by Ocean Bank. This is adequate consideration by FACE.[22]
Nothing compelled FACE to subordinate its first mortgage position. Instead, FACE did so in
conjunction with the negotiations related to the Ocean Bank transaction. The Ocean Bank
closing conferred a benefit on Sundale and Mr. Scutieri. Accordingly, Defendants' Seventh
Affirmative Defense fails.

## THE DEFENDANTS' RECOUPMENT CLAIM

In Count II of their Counterclaim the Defendants seek recoupment of all payments
Sundale made to FACE. The basis of the recoupment claim is that the FACE Loans are
unenforceable based on the 1) the fact the "loans" were not intended to be repaid, 2) the loan
payments were forced due to the economic duress Mr. Scutieri and Sundale were under at the
time the loans were paid and 3) Mr. Chambers, through his various agents, fraudulently induced
Mr. Scutieri and Sundale to agree to the fake loans.

The common law doctrine of recoupment, while often merged with its sister right of
setoff in other contexts, is a separate and distinct doctrine in bankruptcy. Recoupment "allows a
defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff
which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's
claim." *Akincibasi v. Moscaritolo (In re Akincibasi)*, 372 B.R. 80, 84 (Bankr. M.D. Fla. 2007)
(quoting *In re Holford*, 896 F.2d 176, 178 (5th Cir. 1990)).

Assuming recoupment would be a remedy available to Defendants[23], for the reasons I
have set forth above, I find that the Defendants have failed to prove they have any claim against
FACE. I hold that the amounts due FACE from the Defendants were always intended to be loans

---

[22] As I already stated, since Michael Inglis is not a party to this adversary proceeding, I am not making any finding
regarding the adequacy of consideration for the release in his favor.
[23] FACE cites a variety of grounds why Sundale and Mr. Scutieri are not entitled to assert a recoupment claim,
none of which I need address since the counter-plaintiffs failed to meet their initial burden. FACE also raised a
number of affirmative defenses each of which I find are well grounded.

to be repaid, that neither Sundale nor Mr. Scutieri was under economic duress at the time the loans were paid or the Release and Reaffirmation were signed, and that none of Mr. Chambers, VBM, Mr. Roy, FACE or Mr. Inglis fraudulently induced the Defendants to agree to the FACE Loans, and that, moreover, any such claims to the contrary were released in September 2001.

Accordingly, Judgment on Count II of the Counterclaim is granted in favor of FACE and against Sundale and Mr. Scutieri.

## <u>CONCLUSION</u>

Mr. Scutieri has been locked in bitter litigation with Mr. Chambers for many years. To my knowledge there is still litigation ongoing between the parties. As I told Mr. Scutieri at the inception of this litigation, the results of this litigation do not depend on the truth of what happened between Mr. Chambers and Mr. Scutieri's father. Whether or not Mr. Chambers used assets that belonged to Mr. Scutieri Sr.'s estate has no bearing on whether and under what conditions Mr. Chambers, directly or indirectly, agreed to provide funding to Sundale for the Hotel Project. Nor does it matter whether Mr. Chambers' decision to help Mr. Scutieri was motivated by fear of "the truth" being revealed or by Mr. Chambers' historical relationship with the Scutieri family. Finally, the truth of what actually occurred has no bearing on the enforceability of the applicable loan documents, either those preceding the Ocean Bank Closing, or those that were executed in connection with that Ocean Bank Closing.

It will be for another court to decide that truth of the estate allegations; what I need to decide is clear – and I hold, based on the facts presented at trial and for the reasons set forth in this opinion that the Plaintiff has proved its case and Defendants have completely failed to prove theirs. The Plaintiff is directed to prepare a Final Judgment in favor of the Plaintiff consistent with this opinion.

# # #

Copies furnished to:
Peter Russin, Esq.
James Gassenheimer, Esq.
Greg Grossman, Esq.

Attorney Gassenheimer is directed to mail a copy of this Order to all interested parties and to file a certificate of service with the Clerk of the Bankruptcy Court.